J-S08015-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: L.C., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: M.C., MOTHER | |
| | No. 1355 WDA 2016 |

Appeal from the Order Entered August 15, 2016
In the Court of Common Pleas of Beaver County
Domestic Relations at No(s): CP-04-DP-0000057-2015/ Juv. No. 141-2015

| | |
|---|---|
| IN RE: L.C., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: M.C., MOTHER | |
| | No. 1417 WDA 2016 |

Appeal from the Order Entered August 15, 2016
In the Court of Common Pleas of Beaver County
Orphans' Court at No(s): 3022-2016

BEFORE: GANTMAN, P.J., FORD ELLIOTT, P.J.E., and SOLANO, J.

MEMORANDUM BY SOLANO, J.:                    **FILED MARCH 27, 2017**

Appellant M.C. ("Mother"), appeals from the orders that changed the goal from reunification to adoption and terminated her parental rights to L.C. (born February 2015) involuntarily. On appeal, Mother challenges the sufficiency of evidence supporting the trial court's decisions. We affirm.

We adopt the trial court's recitation of the facts and procedural history:

> [L.C.] was placed voluntarily with Mother's cousin, [E.C.], and her family on April 5, 2015, when Mother was arrested and incarcerated. [L.C.] was approximately 6 weeks old at the time of his placement. CYS made two attempts to return [L.C.] to his Mother between April and December 2015, without success. At that time, CYS filed a dependency action and [L.C.] was formally placed with [E.C.] by the court in December 2015.
>
> From the inception of this case, Mother . . . has failed to comply with the terms and conditions of the family service plan. She was told from the beginning of the case that she needed to complete certain services. A drug and alcohol evaluation was recommended on June 14, 2015. One was scheduled for December 29, 2015, but was not completed because she refused to sign a release. She finally obtained the drug and alcohol evaluation in May 2016, right before a scheduled court date of June 28, 2016, and nearly a full year after she was requested to do so. She failed to obtain her neuro-psychological report and went to Allegheny General Hospital (AGH) to inquire about scheduling part 2 of the exam on August 3, 2016, immediately prior to the hearing set for August 8, 2016.
>
> Mother was to start parenting classes in December 2015. She started the classes and then no-showed, to the point where the classes had to be discontinued due to her lack of attendance. Another request for parenting classes was submitted on June 1, 2016. To date, Mother attended 7 sessions, but only completed 3-4 of the 16-20 lessons, needed to complete the course. Mother's lack of focus during the parenting sessions is still a concern.
>
> Mother was offered 30 visits with [L.C.] since the last hearing. She missed two visits (because she did not confirm or tried to confirm too late) and she was late for 25 visits. As the foster father testified, being late for doctor's appointments means your child does not get seen. Being late for school, means your child gets reported for truancy. Mother was also late for both days of her court

hearings on the petition for a goal change and to terminate parental rights.

Mother's visits with [L.C.] go well. She brings toys and food for him. At least one time, she lost sight of him when she left him unattended. Mother's housing remains unstable. Although Mother currently has a lease for a house in Monaca, she refused to sign a release for CYS to speak with the landlord to confirm her housing arrangement until a week before trial. Throughout the course of this case, her housing has been an issue. She has resided in 4-5 different locations, and was homeless for several months. Despite moving to her current residence, a four bedroom home, in May 2016, she did not prepare a bedroom for [L.C.] until August 6, 2016, two days prior to the hearing to change the goal and terminate her parental rights. Her only explanation for not having this done sooner was they "have a lot going on." CYS tried numerous times to visit the home to see if it was appropriate for [L.C.], but no one ever answered the door. The only time CYS saw the home was twice when parenting choices was there for a visit. Each time CYS was there, the room for [L.C.] was filled with moving boxes and bins.

Mother's relationship with her current boyfriend [Mr. O.] remains unstable. She has been dating Mr. [O.] since late 2015. At the hearing in November or December 2015, she testified that she and Mr. [O.] were engaged. They broke up after cross PFA's were filed in January 2016. They were in a heated argument during a parenting class in February, 2016, where the parenting instructor thought she was going to have to call 9-1-1. The parenting instructor was concerned for Mother's safety. Apparently, Mother and her boyfriend are back together, but the police were called to their residence as recently as May 2016. Mother did not indicate that they were engaged at this time, but that they were working on their relationship. Mr. [O.] did not attend the hearing.

Due to the volatile relationship with Mr. [O.], CYS requested on February 2016 that Mother attend anger management. She did not start going until four months later, on June 3, 2016.

Mother identified 15 family members and friends who could provide support for her. A family group decision making conference was scheduled for April 2016, but none of the friends or family attended.

Mother's income is $741 per month from social security. She did not provide proof of her income at the hearing. She resides with Mr. [O.] in a rental home that costs $800 per month. She does not have a back-up plan for housing if they break up. She claimed that she and Mr. [O.] have a signed agreement, whereby he will continue to support her for some unknown length of time, in an unknown monetary amount. She did not provide a copy of this agreement. She has saved $1500 in the event of an emergency. She may start working for a friend who has a hair salon, but did not provide details about her prospective wages, hours, or daycare plans for [L.C.] if she were employed.

Although the court has no doubt that Mother loves [L.C.], the court does not believe that she can remedy the situation that led to the child's removal within a reasonable time given the history of this case, as discussed herein. Many of the conditions which lead to the removal of the child continue to exist. The child has now been in placement for 16 months, since he was only 6 weeks old.

Having found that CYS met its burden of proof, with respect to terminating Mother's parental rights, the court must also examine the bond between the juvenile and parent and between the juvenile and the foster parents. [L.C.] does have a bond with his mother, but the strength of that bond does not compare to the strong bond he has with his foster family. At this point, [L.C.] has been with his foster family for almost 500 days of the 550 he has been alive. Over 90% of his life has been in foster care. He now calls his foster mom and dad "mama and dada" without coaching from them. He has a very strong bond with his foster siblings, who adore him. Two of them came to the hearing to show their support for [L.C.]. They consider [L.C.] to be their brother and would be devastated if he were taken from them. Although [L.C.] is too young to voice an opinion, the court believes that

[L.C.] would also be devastated if he were removed from the only family he has known for most of his life. At this point, based on the lack of compliance and progress Mother has made while [L.C.] has been in foster care these past 15 months, the court believes it would be more detrimental to [L.C.] to break the bond with his foster family than with his natural mother. Any trauma caused by breaking the bond with his natural mother is outweighed by the benefit of moving [L.C.] toward a permanent home.

Trial Ct. Op., 10/27/16, at 1-5. We add that a CYS caseworker testified without objection that if Mother's parental rights were terminated, then Child's father, who is not a party to this appeal, said to the caseworker that he would voluntarily relinquish his parental rights. N.T., 8/8/16, at 59.

Mother timely appealed and filed a Pa.R.A.P. 1925(b) statement. Mother raises the following issues:

Whether the trial court abused its discretion and/or erred as a matter of law in concluding the agency (CYS) established by clear and convincing evidence grounds to terminate [Mother's] parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(5)?

Whether the trial court abused its discretion and/or erred as a matter of law in concluding the agency (CYS) established by clear and convincing evidence grounds to terminate [Mother's] parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8)?

Whether the trial court abused its discretion and/or erred as a matter of law in concluding that termination of [Mother's] parental rights would serve the needs and welfare of the child pursuant to 23 Pa.C.S.A. § 2511(b)?

Whether the trial court abused its discretion and/or erred as a matter of law in concluding the agency (CYS) established sufficient grounds for a goal change from "return to parent" to "adoption"?

> Whether the trial court abused its discretion and/or erred as a matter of law in admitting evidence and testimony over objections from [M]other's counsel?

Mother's Brief at 4.

We consider Mother's issues in light of our established standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101–2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best

- 6 -

interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). The burden is on the petitioner seeking termination to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are met. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

We will affirm if we agree with the trial court's decision as to any one subsection of 23 Pa.C.S. § 2511(a), and its decision as to Section 2511(b). *In re B.L.W.,* 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004); *see In re N.A.M.*, 33 A.3d 95, 100 (Pa. Super. 2011). Here, we affirm the trial court's decision to terminate Mother's parental rights under subsections 2511(a)(8) and (b), which provide:

> **(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds: . . .
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\*   \*   \*

- 7 -

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(8), (b).[1]

We review the order changing the goal from "return to parent" to "adoption" for an abuse of discretion. *In re M.T.*, 101 A.3d 1163, 1172 (Pa. Super. 2014) (*en banc*). The Court explained that "[i]n a change of goal proceeding, the best interests of the child, and not the interests of the parent, must guide the trial court, and the parent's rights are secondary. The burden is on the Agency to prove the change in goal would be in the child's best interests." *Id.* at 1173 (citations omitted). "[O]ur Supreme Court has instructed that we cannot find an abuse of the trial court's discretion where the record supports the trial court's decision that a goal change to adoption is 'best suited to the safety, protection and physical,

---

[1] Mother also challenges the sufficiency of evidence with respect to termination under Section 2511(a)(5). Because we affirm the trial court's decision under subsection (a)(8), *infra*, we need not address her other subsection (a) arguments. *See B.L.W.*, 843 A.2d at 384.

mental and moral welfare of the child.'" *In re M.T.*, 101 A.3d at 1177 (citation omitted); *see In re R.J.T.*, 9 A.3d 1179 (Pa. 2010).

We summarize all of Mother's arguments together. Mother marshals evidence from the record in her favor and then contends that the evidence was insufficient for subsections (a)(5), (a)(8), and (b). She disputes some of the trial court's findings. Mother also complains the court improperly weighed the bond between her and L.C. She reiterates these arguments with respect to her assertion that the court erred in changing the goal to adoption. Finally, Mother alleges that it was reversible error for the court to admit evidence of a protection from abuse petition filed against her because it was inadmissible hearsay.[2]

After careful review of the record, the parties' briefs, and the trial court's decision, we affirm on the basis of the trial court opinion by the Honorable Deborah Kunselman. *See* Trial Ct. Op. at 5-13 (holding (1) sufficient evidence existed to terminate Mother's parental rights under subsection (a)(8); (2) court evaluated Child's bond with his foster family and Mother and concluded it would be adverse to Child's best interest to remove Child from his foster family; (3) record established it was in Child's best interest to change the goal to adoption; and (4) court could take judicial

---

[2] Mother also contends the court erred by permitting a caseworker to testify, over her objection, about the protection from abuse petition and her prior arrests. This argument is waived as it was not raised in Mother's Rule 1925(b) statement. *See generally Commonwealth v. Lord*, 719 A.2d 306, 309 (Pa. 1998).

notice of PFA petition involving Mother and an official copy was not required). Because we discern no abuse of discretion or error of law, we affirm the orders below. *See In re T.S.M.*, 71 A.3d at 267; *In re M.T.*, 101 A.3d at 1172. The parties are instructed to include the attached trial court decision in any filings referencing this Court's decision.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/27/2017

IN THE COURT OF COMMON PLEAS OF BEAVER COUNTY
PENNSYLVANIA
JUVENILE DIVISION / ORPHANS COURT

In the Interest of:

L.L.C., a Minor
DOB: 2/██/2015

Juv. No. 141 of 2015

Orphans' Court No: 3022 of 2016

## 1925 (a) OPINION

D. KUNSELMAN, J.                                   OCTOBER 27, 2016

The court held a hearing to change the goal to adoption and to terminate the parental rights of the Mother on August 8 and August 10, 2016. At this hearing, Mother contested both the goal change and the termination. At the conclusion of the hearing, the court found the goal should be changed and terminated the Mother's parental rights. Mother appeals these decisions.

## FINDINGS OF FACT

L.L.C. was placed voluntarily with Mother's cousin, E██ C██ and her family on April 5, 2015, when Mother was arrested and incarcerated. L.L.C. was approximately 6 weeks old at the time of his placement. CYS made two attempts to return L.L.C. to his Mother between April and December 2015, without success. At that time, CYS filed a dependency action and L.L.C. was formally placed with the██ by the court in December 2015.

From the inception of this case, Mother, M██ C██ has failed to comply with the terms and conditions of the family service plan. She was told from the beginning of the case that she needed to complete certain services. A drug and alcohol evaluation was recommended on June 14, 2015. One was scheduled for December 29, 2015, but was

1

not completed because she refused to sign a release. She finally obtained the drug and alcohol evaluation in May 2016, right before a scheduled court date of June 28, 2016, and nearly a full year after she was requested to do so. She failed to obtain her neuro-psychological report and went to Allegheny General Hospital (AGH) to inquire about scheduling part 2 of the exam on August 3, 2016, immediately prior to the hearing set for August 8, 2016.

Mother was to start parenting classes in December 2015. She started the classes and then no-showed, to the point where the classes had to be discontinued due to her lack of attendance. Another request for parenting classes was submitted on June 1, 2016. To date, Mother attended 7 sessions, but only completed 3-4 of the 16-20 lessons, needed to complete the course. Mother's lack of focus during the parenting sessions is still a concern.

Mother was offered 30 visits with L.L.C. since the last hearing. She missed two visits (because she did not confirm or tried to confirm too late) and she was late for 25 visits. As the foster father testified, being late for doctor's appointments means your child does not get seen. Being late for school, means your child gets reported for truancy. Mother was also late for both days of her court hearings on the petition for a goal change and to terminate parental rights.

Mother's visits with L.L.C. go well. She brings toys and food for him. At least one time, she lost sight of him when she left him unattended.

Mother's housing remains unstable. Although Mother currently has a lease for a house in Monaca, she refused to sign a release for CYS to speak with the landlord to confirm her housing arrangement until a week before trial. Throughout the course of this case, her housing has been an issue. She has resided in 4-5 different locations,

2

and was homeless for several months. Despite moving to her current residence, a four bedroom home, in May 2016, she did not prepare a bedroom for L.L.C. until August 6, 2016, two days prior to the hearing to change the goal and terminate her parental rights. Her only explanation for not having this done sooner was they "have a lot going on." CYS tried numerous times to visit the home to see if it was appropriate for L.L.C., but no one ever answered the door. The only time CYS saw the home was twice when parenting choices was there for a visit. Each time CYS was there, the room for L.L.C. was filled with moving boxes and bins.

Mother's relationship with her current boyfriend remains unstable. She has been dating Mr. O████ since late 2015. At the hearing in November or December 2015, she testified that she and Mr. O████ were engaged. They broke up after cross PFA's were filed in January 2016. They were in a heated argument during a parenting class in February, 2016, where the parenting instructor thought she was going to have to call 9-1-1. The parenting instructor was concerned for Mother's safety. Apparently, Mother and her boyfriend are back together, but the police were called to their residence as recently as May 2016. Mother did not indicate that they were engaged at this time, but that they were working on their relationship. Mr. O████ did not attend the hearing.

Due to the volatile relationship with Mr. O████, CYS requested on February 2, 2016 that Mother attend anger management. She did not start going until four months later, on June 3, 2016.

Mother identified 15 family members and friends who could provide support for her. A family group decision making conference was scheduled for April 2016, but none of the friends or family attended.

3

Mother's income is $741 per month from social security. She did not provide proof of her income at the hearing. She resides with Mr. O⬛⬛⬛ a rental home that costs $800 per month. She does not have a back-up plan for housing if they break up. She claimed that she and Mr. O⬛⬛ have a signed agreement, whereby he will continue to support her for some unknown length of time, in an unknown monetary amount. She did not provide a copy of this agreement. She has saved $1500 in the event of an emergency. She may start working for a friend who has a hair salon, but did not provide details about her prospective wages, hours, or daycare plans for L.L.C. if she were employed.

Although the court has no doubt that Mother loves L.L.C., the court does not believe that she can remedy the situation that led to the child's removal within a reasonable time given the history of this case, as discussed herein. Many of the conditions which lead to the removal of the child continue to exist. The child has now been in placement for 16 months, since he was only 6 weeks old.

Having found that CYS met its burden of proof, with respect to terminating Mother's parental rights, the court must also examine the bond between the juvenile and parent and between the juvenile and the foster parents. L.L.C. does have a bond with his mother, but the strength of that bond does not compare to the strong bond he has with his foster family. At this point, L.L.C. has been with his foster family for almost 500 days of the 550 he has been alive. Over 90% of his life has been in foster care. He now calls his foster mom and dad "mama and dada" without coaching from them. He has a very strong bond with his foster siblings, who adore him. Two of them came to the hearing to show their support for L.L.C. They consider L.L.C. to be their brother and would be devastated if he were taken from them. Although L.L.C. is too young to

4

voice an opinion, the court believes that L.L.C. would also be devastated if he were removed from the only family he has known for most of his life. At this point, based on the lack of compliance and progress Mother has made while L.L.C. has been in foster care these past 15 months, the court believes it would be more detrimental to L.L.C. to break the bond with his foster family than with his natural mother. Any trauma caused by breaking the bond with his natural mother is outweighed by the benefit of moving L.L.C. toward a permanent home.

## ANALYSIS OF ISSUES RAISED ON APPEAL

In a permanency hearing where goal change is being considered, the court should consider the full record that reflects the parents' compliance and progress as it relates to whether they have remedied (or will remedy) the circumstances that led to removal and placement of the child. In the ordinary permanency hearing, the court is generally looking at what has transpired between review hearings. At the time of the permanency hearing, with the goal change emphasis, the *full* history and record is relevant. Thus, the court examined the full record when reaching its determination in this case.

### I. Termination of Parental Rights

In a termination of parental rights hearing, the court must examine whether there is clear and convincing evidence of parental conduct meeting the statutory requirements for involuntary termination. Combining the goal change and the termination of parental rights hearing is recommended, when possible, because it results in one appeal, which enhances timely permanence for children. In this case, both the goal change and the

5

termination were considered on August 8 and August 10, 2016. The court granted both petitions and the Mother appealed.

The court concluded that CYS met its burden of proof for termination by clear and convincing evidence on two separate grounds, 23 Pa. C.S.A. §§ 2511(e) and (h). First, the child has been removed from the care of the parent(s) by the court or under a voluntary agreement with an agency for a period of least six (6) months, the conditions which led to the removal or placement of the child continue to exist, the parent(s) cannot or will not remedy those conditions within a reasonable period of time, the service or assistance reasonably available to the parent(s) are not likely to remedy the condition which led to the removal or placement of the child within a reasonable time period and termination of the parental rights would best serve the needs and welfare of the child. And, second, the child has been removed from the care of the parent by the court, twelve months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best service the needs and welfare of the child.

Mother has raised five issues on appeal with respect to the court's decision in this matter. The court will discuss each of these issues.

### 1. The trial court did not fail to adequately consider the bond that existed between Mother and the child.

In the court's findings of fact, issued with the decision to terminate in this matter, the court adequately considered the bond between Mother and the child. We noted,

> "Having found that CYS met its burden of proof with respect to terminating Mother's parental rights, the court must also examine the bond between the juvenile and parent and between the juvenile and the foster parents. **L.L.C. does have a bond with his mother, but the strength of that**

6

bond does not compare to the strong bond he has with his foster family. At this point, L.L.C. has been with his foster family for almost 500 days of the 550 he has been alive. Over 90% of his life has been in foster care. He now calls his foster mom and dad "mama and dada" without coaching from them. He has a very strong bond with his foster siblings, who adore him. Two of them came to the hearing to show their support for L.L.C... They consider L.L.C. to be their brother and would be devastated if he were taken from them. Although L.L.C. is too young to voice an opinion, the court believes that L.L.C. would also be devastated if he were removed from the only family he has known for most of his life. At this point, based on the lack of compliance and progress Mother has made while L.L.C. has been in foster care these past 15 months, **the court believes it would be more detrimental to L.L.C. to break the bond with his foster family than with his natural mother. Any trauma caused by breaking the bond with his natural mother is outweighed by the benefit of moving L.L.C. toward a permanent home.**" (emphasis added).

In analyzing the parent-child bond, the orphan's court is not required by statute or precedent to order a formal bonding evaluation be performed by an expert. In the matter of KKR-S, 958, A.2d 529, 533 (Pa. Super. 2008). Here, the court did not believe expert testimony was necessary to establish that the bond with Mother was not as strong as the bond with the foster family.

### 2. The trial court did not err in concluding that termination of the Mother's parental rights would best serve the needs and welfare of the child.

Under the facts of this case, the court concluded that the needs and welfare of the child would best be promoted by terminating the parental rights of Mother. Mother simply is unable to meet the parental duties required for the well-being of the child. As the trial court stated in In re CLG, 956 A.2d 999 (Pa. Super. 2008), "the parents in this matter have duty, like all parents, to ensure their child's wellbeing in a stable environment, where there is a safe, healthy home and where a parent can and does put the child's needs paramount to his or her own."

7

Here, Mother has not demonstrated that she is capable of putting L.L.C.'s needs ahead of her own. She is repeatedly late for almost every visit and hearing. She and her boyfriend, with whom she currently resides, have had a tumultuous relationship that has gotten violent in the past, to the point where Protection from Abuse orders were filed. She has moved around frequently throughout the course of this case, staying with boyfriends and other friends. And, although she currently has a home that would be big enough for L.L.C., and she moved to that home four months prior to the hearing, she neglected to get a bedroom ready for L.L.C. until a few days prior to the hearing to terminate her parental rights. She had all summer to do this, but apparently, "had a lot going on" and was unable to make her son's needs a priority.

On the other hand, the foster family has put their lives on hold to take care of all of L.L.C.'s needs. They have given him a safe and healthy home, taken him to all doctor's appointments, met his financial needs and provided a stable environment. Terminating Mother's rights and allowing L.L.C. to be adopted by his foster family would undoubtedly best serve the needs and welfare of the child.

3. *The trial court did not fail to adequately consider services that were completed by Mother or were in the process of being completed, in accordance with the CYS service plan, and the reasons offered as to why other services were not completed.*

Although Mother did complete some services, she waited until right before a court date to take any action, and she failed to follow through on most of what she was required to do. She was told from the beginning of the case that she needed to complete certain services. A drug and alcohol evaluation was recommended on June 14, 2015. One was scheduled for December 29, 2015, but was not completed because she refused to sign a release. She finally obtained the drug and alcohol evaluation in

8

May, 2016, right before a scheduled court date of June 28, 2016, and nearly a full year after she was requested to do so. She failed to obtain her neuro-psychological report and went to AGH to inquire about scheduling part 2 of the exam on August 3, 2016, immediately prior to the hearing set for August 8, 2016. That evaluation remains incomplete after several months.

Mother was to start parenting classes in December 2015. She started the classes and then no-showed, to where the classes had to be discontinued due to her lack of attendance. Another request for parenting classes was submitted on June 1, 2016, six months later. As of August 8 and 10, mother attended 7 sessions, but only completed 3-4 of the 16-20 lessons, needed to complete the course. Mother's lack of focus during the parenting sessions is still a concern.

Thus, the court considered Mother's partial compliance with services, but believed her excuses for failing to follow through with and to complete the services were inadequate. Again, she simply cannot show that she is willing to put the needs of her child ahead of her own whims. None of these recommended services were a priority for her.

### 4. The trial court did not err in concluding that the child had been removed under voluntary agreement or the court for twelve months under section (a)(8), because the child was placed with the foster family in April 2015 and the court terminated Mother's rights in August 2016, 16 months later.

Significantly, this child was voluntarily placed with the foster family in April 2015. There were attempts to return the child home between April and December 2015, which were unsuccessful. Once it became apparent that reunification may not be possible, CYS filed a dependency petition on or about October 2, 2015, and the child was adjudicated dependent on December 17, 2015. The statute provides the twelve month

9

period begins to run under either a voluntary placement OR a court ordered placement. Thus, Mother's contention that twelve months did not pass from the time of the adjudication until termination of parental rights is correct, but without merit, since the relevant timeline begins when the child was removed from the home, not when the child is adjudicated dependent. Because L.L.C. was removed from his home for 16 months, CYS met its burden to show more than twelve months had passed, as required for termination under section 23 Pa. C.S.A. § 2511(a)(8).

### 5. The court did not err in admitting and considering evidence submitted by CYS including but not limited to the CYS report to court (CYS Exhibit 1) and a PFA Petition (CYS Exhibit 2).

The CYS report to court was admitted over objection of Mother's counsel. Although the report may be considered hearsay for purposes of the Termination of Parental Rights hearing, it is admissible for the Permanency Review hearing. Moreover, the person who authored the report, the CYS caseworker, testified about the facts contained in the report and was subject to cross-examination.

The PFA Petition was relevant evidence and an official court document from a related case, where Mother was a party. This was a pleading from a Beaver County case, that was heard by the same judge who heard the termination of parental rights hearing. The court is permitted to take judicial notice of court documents. *See* 42 Pa. C.S.A. § 6102. Although the document did not contain an official seal, the document did not have a lack of trustworthiness. Additionally, the objection that the petition was a copy and not the original was overruled pursuant to Rule 1003, which provides that a duplicate copy may be accepted as an original. The burden of establishing the need for the original is on the opponent of the submission. Rule 1003[1] comment 1. Here,

10

Mother did not establish any need for the original document, or any evidence that the document was not what it purported to be. The court did not consider the facts alleged in the petition, but rather, in deciding to terminate her parental rights, the court considered that Mother was a defendant in a PFA action while the dependency litigation was active, and is now living with the person who filed the PFA against her.

Any error in admitting or considering either of these documents was harmless, due to the overwhelming evidence in favor of the termination of Mother's parental rights.

## II. Goal Change

Mother also appealed the court's decision with respect to the change of goal from reunification to adoption. She raised three issues in this appeal, which the court will address.

### 1. The court did not err or abuse its discretion in finding adequate grounds existed to change the goal form "return to parent" to "adoption"

CYS is required to ask for a change in permanency when a child has been in care for 15 out of the last 22 months. Appropriately, in this case, CYS filed such a request. The court is not required to grant the request. The court must consider multiple factors in reaching its conclusion. Here, the court concluded Mother was not complying with services despite numerous requests to do so. She did not have stable housing, or a stable relationship. The child has been in placement for a long time and is in a pre-adoptive home. If Mother had demonstrated that she was getting her act together, the court may not have granted the change of goal. However, she showed the opposite. After her child remained in placement for 16 months, Mother is no further ahead today than she was in April 2015.

11

2. The court did not err in concluding that the change of goal would best serve the needs and welfare of the child and adequately considered the bond between the Mother and Child.

As noted throughout this opinion, the court concluded that changing the goal would best meet the needs and welfare of L.L.C., because he is with a family that puts his needs first. They don't have "a lot going on" such that they cannot prepare a bedroom for him or take him to his appointments on time. Mother has not shown, throughout the course of this dependency case, that she cannot be responsible for L.L.C.. She was late to almost every visit and court hearing. She never went to her appointments until right before the hearing dates. She has unstable housing and remains in a volatile relationship. The family where L.L.C. has been living has been attending to all of his needs on a regular basis. Evidence showed that the bond between L.L.C. and his foster family is very strong and he recognizes the C████ as his parents. It is the only home he has known since he was 6 weeks old. The court correctly concluded that adoption would best serve his needs and welfare. Additionally, the court's conclusion that the bond between Mother and the child was not as strong as the bond between the foster family and the child was amply supported by the evidence.

3. **The could adequately considered services that were completed by Mother or were in the process of being completed, in accordance with the service plan, and the reasons offered as to why other services were not completed.**

Mother failed to offer any legitimate, credible reason why certain services were not completed. Mother had more than sufficient time to obtain services and waited until the last possible time to start them. Services were terminated due to her lack of attendance, and when she did attend her lack of focus was a concern. Even at the hearings in this matter, with the assistance of counsel, Mother could not stay focused on

12

the task at hand. Her testimony was very difficult to follow, as she rarely answered a question directly. The court understands that these proceedings are difficult for parents, but Mother's behavior was erratic and at times incomprehensible. Appointments were made for her to attend a parenting evaluation and neuro-psychiatric evaluations and she failed to attend. She offered no valid excuse for this. Mother refused to answer calls from CYS to look at her new home when she moved in May, and for four months she neglected to prepare a bedroom for her son. The court questions whether Mother can adequately take care of herself, let alone her very young son. The court did not believe that Mother would complete the services within a reasonable time, so that reunification could be successfully and timely accomplished.

BY THE COURT

*Deborah A. Kunselman*

J.

BY THE COURT

2016 OCT 27 A 8:44

DEBORAH A. KUNSELMAN
JUDGE

COMMON PLEAS
COURT OF
BEAVER COUNTY

2016 OCT 27 P 1:42

JUVENILE SERVICES
RECEIVED